IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DARRYL CARTER,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )    Case No. 15 C 1407
                                  )
SHERIFF OF COOK COUNTY,           )
THOMAS J. DART, and THE           )
COUNTY OF COOK, ILLINOIS,         )
                                  )
          Defendants.             )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Darryl Carter ("Carter") has sued Cook County

Sheriff, Thomas J. Dart, ("the Sheriff")[1] and Cook County,

Illinois ("the County"), alleging discrimination, hostile work

environment, and retaliation claims under Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*

---

[1] Claims under Title VII are properly brought only against an
individual's employer. *See, e.g.*, *Carver v. Sheriff of LaSalle
Cty., Illinois*, 243 F.3d 379, 381 (7th Cir. 2001). Since the
Sheriff, not the County, is Carter's employer, the County cannot
be held independently liable for the Title VII violations Carter
alleges. *Id*. Similarly, because the Sheriff has the sole
responsibility for operating the Cook County Jail, the County
cannot be held liable for the *Monell* violations Carter alleges.
*See, e.g.*, *Jacoby v. DuPage Cty. Ill.*, No. 12 CV 6539, 2013 WL
3233339, at *2 (N.D. Ill. June 26, 2013). However, the County is
responsible for paying any judgments entered against the
Sheriff. *See, e.g.*, *Carver v. Sheriff of LaSalle Cty., Illinois*,
324 F.3d 947, 948 (7th Cir. 2003).  Thus, the County is properly
named as a defendant in the suit only for purposes of
indemnification.

Carter also asserts a claim under 42 U.S.C. § 1983, alleging that the Sheriff violated his civil rights by failing to address his complaints of discrimination and harassment. The Sheriff has moved for summary judgment as to all of Carter's claims. For the reasons below, the motion is granted in part and denied in part.

I.

Carter was hired as a Cook County Sheriff's Officer in June 1988. In November 2007, he circulated a memorandum to the Cook County Board President, the Cook County Board of Commissioners, and the Sheriff, claiming that he had consistently been passed over for promotion because of his race (African-American). The following month, Carter was promoted to the position of correctional sergeant.

Since that time, Carter has applied for further promotion on several occasions but with no success. He applied for the position of correctional lieutenant in 2009, 2011, 2013, and 2015. In each case, Carter was informed that his application had been denied because he failed to achieve a passing score on the lieutenant's examination, and also because his applications were untimely. In August 2010 and March 2012, Carter applied for promotion to the higher-ranking position of correctional chief. In both cases, Carter was informed that he was ineligible for

the position because he did not hold the position of lieutenant, which the job announcement listed as a minimum requirement.[2]

During this time, Carter also began complaining of harassment. In July and August 2010, he circulated memos to his superiors and other officials claiming that he had been disciplined for minor infractions routinely overlooked in the case of non-African-American employees. He also complained that he had been disciplined for failing to carry out tasks that he was never trained to perform. The record does not indicate how, if at all, the Sheriff responded to Carter's complaints at this time.

On or about April 3, 2012, while assigned as a sergeant in Division 1 of the Cook County Jail, Carter went to the office of his superior, Superintendent Mario Reyes ("Reyes"), to collect his payroll stub. The words "Dick sucker bitch" were written on the envelope.[3] On or about the same day, Carter discovered a flier featuring a picture of an unidentified naked black man

---

[2] Carter's March 2012 application for the position of chief was also denied as untimely.

[3] Carter is unclear about the extent to which he believes Reyes was involved in this incident. Carter does not allege that Reyes was responsible for the writing on the envelope. However, in the internal complaint Carter subsequently filed in connection with the incident, Reyes is listed as one of the individuals accused. *See* Defs.' Ex. 24. At the same time, in connection with his hostile workplace claim, Carter specifically disclaims any contention that his supervisors were involved in his harassment. *See infra* at 18-19.

posted in the lobby of Division 1. The flier included the following text: "EVERY THINGS GOES"; "THE FIRST PERSONS GETS A HEAD JOB BY THE ONE AND ONLY MR. D-CARTER..."; and "FREE FOOD." *See* Compl. Ex. D. Carter's street address was also included on the flier ("VERA SON DARYL CARTER IS HAVING A PARTY @ OUR HOME 12717 S. ELIZABETH CALUMET PARK."), as was as his previous phone number ("CALL ME 1708-926-9116"). *Id*. It turned out that between 180-200 copies of the flier had been posted in various places throughout Division 1, including areas to which the jail's detainees had access. There is evidence to suggest that the pictures had been on display for the entire previous week, during which Carter had been on vacation.

At the time, Carter told Superintendent Reyes that he believed two of his subordinates, both African-American females, were responsible for the incident. Carter told Reyes that he suspected the employees had posted the fliers to get back at him for disciplinary citations he had issued to them. The next day, Reyes held a roll call and reminded personnel of the Sheriff's Office's policy against harassment. Reyes also began locking up employee paystubs, which until that time had been left in an unattended area. In addition, Reyes suggested to Carter that he discipline his subordinates verbally before writing them up, so as to avoid the appearance that Carter was singling out anyone for punishment. Lastly, Reyes advised Carter to fill out a

"complaint register" to initiate an investigation by the Sheriff's Office of Professional Review (OPR). Carter did not submit the complaint register until December 2013. However, on June 11, 2012, a complaint register regarding the incident was separately filed by Daniel Moreci ("Moreci"), an assistant executive director in the Sheriff's Office.

During April and May 2012, Carter was offered three opportunities to transfer out of Division 1. He turned each of these down.[4] Carter declined a transfer to Division 10 of the jail, stating that the mother of his child worked there and that the two did not get along. He declined a transfer to Division 11, stating "that's just another part of the jail, it won't change anything," Defs.' L.R. 56.1 Stmt. ¶ 27. Carter also refused an offer for an administrative transfer.[5]

---

[4] In his response to the Sheriff's Local Rule 56.1 Statement, Carter purportedly denies that he turned down the transfers; however, he provides no explanation or citation to the record in support of his denial. *See* Pl.'s L.R. 56.1 Resp. ¶¶ 27-30. Carter makes similar unsupported denials in response to many of the Sheriff's other statements of material fact. In each of these instances, I have deemed the Sheriff's allegations admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(B) (requiring that a party's disagreement with a moving party's statement of material facts make "specific references to the affidavits, parts of the record, and other supporting materials relied upon").

[5] The parties do not explain the difference between an administrative transfer and the other transfers Carter was offered.

A second incident occurred on August 24, 2013, when Carter reported to work and found pictures of his face posted in open view in Division 1's security office and sergeant's office. The following comments had been written on the pictures: "Kool Mo Dee"; "(Skooly B)"; "Ugly"; and "R.I.P." Carter filled out a report in connection with the incident, but the record is unclear as to what actions, if any, were taken at the time. However, in November 2013, Carter sent memos to a number of individuals, including OPR Director Johnathan Myslinski, complaining that he had been subjected to racial discrimination and a hostile work environment. In the memos, Carter stated that his superiors, Superintendent Salomon Martinez ("Martinez") and Commander Vincent Cozzolino ("Cozzolino"), had been disregarding a large number of the disciplinary citations that he and other African-American sergeants were issuing to their subordinates, instead of reporting the incidents further up the chain of command. According to Carter, the citations issued to white and Hispanic employees were being dismissed at a higher rate than those issued to African-Americans. Carter stated that his superiors' actions had resulted in a hostile work environment for African-American sergeants because their subordinates felt that they were able to defy them with impunity. In November 2013, Carter also filled out a complaint register based on these allegations, initiating a second investigation by the OPR.

On July 29, 2014, after having successfully bid for a
transfer to Division 6, Carter found several pictures of the
faces of various unidentified black males taped to the wall in
open view in the sergeant's office. One of the pictures included
handwritten comments stating: "Sgt. Carter"; "Are they serious?
The broad whipped my ass!"; and "Don't you mean your boyfriend!"
A second picture featured the same individual with stitches
drawn on his face and the caption "Domestic Battery." Other
comments on the picture stated: "Sgt. Carter" and "True Playa fa
Real Baby. Don't hate." Three other pictures of black males were
posted elsewhere throughout Division 6. One picture featured the
handwritten comment, "Were my onge belt!!"; another with "I'm
all fried out!!!"; and the third featured the caption, "Domestic
Battery," with the handwritten comment, "Ya heard me!!!" Carter
discovered another picture of one of the same males in the men's
restroom, with the comments "Judge Mathis says:"; "Sgt. Carter";
and "True Playa fa Real Baby. Don't hate."

Carter reported the incident to his superior, Lieutenant
Joe Hurd ("Hurd"), who determined later the same day that the
pictures had been posted by an employee named Cordell Lyons
("Lyons"). Hurd spoke with Lyons and concluded that the incident
had not been malicious. Hurd also held a roll call and advised
employees that "joking, playing, signifying or making references
pertaining to sexual preferences, race, and gender are

unprofessional, against department policy and could lead to discipline or termination." Pl.s' Resp. to Defs.' L.R. 56.1 Stmt. ¶ 43. Additionally, Hurd spoke with Carter, suggesting that Carter might be encouraging such incidents by frequently engaging in playful banter with his subordinates.

The OPR conducted an investigation into the April 2012 incident and concluded in April 2014 that there was insufficient evidence to implicate the employees whom Carter believed had been responsible. The OPR also investigated Carter's November 2013 complaint register and concluded in December 2015 that there was insufficient evidence to support his claims regarding racial disparities in the handling of disciplinary citations.[6]

In the meantime, Carter continued to write memos to various officials regarding his situation, and on September 26, 2014, he filed a charge of discrimination with the Illinois Department of Human Rights (IDHR) and the United States Equal Employment Opportunity Commission (EEOC), alleging that he had been subjected to "different terms and conditions of employment than non-Black employees, including, but not limited to, promotions and discipline." Compl. Ex. A. He also stated that he had been subjected to harassment and a hostile work environment and that he had suffered retaliation as a result of his complaints. On

---

[6] It is undisputed that the OPR never contacted Carter about the resolution of his complaints.

November 19, 2014, the Department of Justice issued Carter a
right-to-sue letter.

On February 13, 2015, Carter filed the instant suit. Count
I of his complaint asserts claims under Title VII, alleging that
the Sheriff failed to promote him, failed to train him, and
subjected him to a hostile work environment on account of his
race. Count II asserts a claim for retaliation under Title VII.
Count III asserts a claim under 42 U.S.C. § 1983 and *Monell v.
Department of Social Services*, 436 U.S. 658 (1978), alleging
that the Sheriff's failure to establish adequate procedures for
addressing employee complaints resulted in the violation of his
civil rights.

## II.

Summary judgment is appropriate when the "pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). I must construe all facts in favor of the nonmoving
party, and may grant summary judgment only "if, on the record as
a whole, a rational trier of fact could not find for the non-
moving party." *Turner v. J.V.D.B. & Associates*, 330 F.3d 991,
995 (7th Cir. 2003).

**A.    Count I**

### 1.  Failure to Promote

In Count I of his complaint, Carter claims that the Sheriff failed to promote him on account of his race. As noted above, Carter applied for promotions on multiple occasions between 2009 and 2015. With respect to several of these applications, Carter's claim is time-barred. "According to statute, a plaintiff ... must file a charge of discrimination with the EEOC or equivalent state agency within 300 days after the alleged unlawful employment practice." *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (quotation marks omitted). "The 300-day limit ... begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has been injured." *Id.* (citation and quotation marks omitted). Here, Carter's EEOC charge was filed on September 26, 2014. Thus, Carter cannot base his claim on any promotions he was denied prior to November 30, 2013.

Carter argues that these earlier incidents are actionable by virtue of the "continuing violations" doctrine, which "allows a court to consider as timely all discriminatory conduct relevant to a claim, so long as there is sufficient evidence of a pattern or policy of discrimination." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 690 (7th Cir. 2001) (quotation marks omitted). It is well settled, however, that an employer's failure to promote an employee is a discrete act, and thus is

not subject to the continuing violation doctrine. *See, e.g.*, *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005) ("[D]iscrete discriminatory employment actions such as termination, failure to promote, denial of a transfer, or refusal to hire are deemed to have been taken on the date they occurred, even if they form part of an ongoing practice or are connected with other acts."). It follows that Carter cannot base his failure-to-promote claim on the denial of his applications for correctional chief in August 2010 and March 2012, or his applications for lieutenant in 2009 and 2011. This leaves only the denial of Carter's 2013 and 2015 applications for lieutenant.[7]

Even putting the problem of untimeliness aside, however, Carter's failure-to-promote claim fails on the merits. In opposing the defendants' summary judgment motion, Carter proceeds under the *McDonnell-Douglas* burden-shifting method. This requires the plaintiff to make out a prima facie case in support of his claim by producing "evidence showing that: (1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected class

---

[7] The exact date of Carter's 2013 application for lieutenant is not clear; however, the Sheriff concedes that Carter's claim is timely insofar as the 2013 and 2015 applications are concerned. *See* Defs.' Mem. Summ. J. at 2.

who was not better qualified for the position." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). If the plaintiff succeeds in making the necessary showing, the burden shifts to the employer, who "must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id*. (quotation marks omitted).

Although Carter correctly sets forth the framework, he fails to adhere to it. Carter begins by asserting that the defendants have failed to "establish that the proffered nondiscriminatory reasons were the actual basis for Carter's promotion denial." Pl.'s Resp. Br. at 5. According to Carter, this is because there is no evidence that John Konrad, the author of the memo informing Carter that his application for correctional chief had been denied in 2010, "was personally involved in the decision not to promote Carter or that he had first hand knowledge of the decision-maker's reasoning." *Id*.

This response suffers from several flaws. To begin with, even assuming that Carter had raised a sufficient basis for questioning the Konrad memo, his argument would address only the denial of Carter's 2010 application (which, in any event, is time-barred). More fundamentally, Carter ignores the fact that, under the burden-shifting framework, questions concerning the

legitimacy of the Sheriff's reasons for failing to promote him arise only after Carter has made out a prima facie case of discrimination. This Carter has failed to do -- or even attempt. He cites no affirmative evidence that he was qualified for either the chief or lieutenant positions. He does not address his failure to achieve a passing score on the lieutenant's examination or the fact that his applications were untimely. Nor does Carter point to any non-African-American candidate who was promoted to the chief or lieutenant position and who was no better qualified than he. In fact, Carter's brief identifies no comparators at all. Carter's complaint alludes to three unnamed individuals who were promoted from sergeant to superintendent. *See* Compl. ¶ 22. In his Local Rule 56.1 Statement, Carter identifies the individuals as Sammie Young, Juan Diaz, and Prentiss Jones. However, there is no mention of these employees in his brief. And in any case, the evidence shows that none of the three can properly serve as comparators. As the Sheriff points out, two of the individuals -- Young and Jones -- are African-American and thus are not outside the protected class; and all three individuals were promoted to the higher-ranking position of superintendent, whereas Carter's claim is based on the Sheriff's failure to promote him to lieutenant or chief. It is undisputed that the superintendent position differs from the lieutenant and chief positions in important respects. For

example, unlike the lieutenant and chief positions, superintendent is a non-career position. Moreover, anyone can apply for the superintendent position, including individuals not currently employed by the Sheriff's Office.

Carter contends that the Sheriff has a policy of "meritorious promotion," which allows individuals to be promoted without taking an examination. The Sheriff argues that this contention is not supported by the evidence on which Carter relies. I disagree. Carter's argument is based on the testimony of Lieutenant Hurd, who, when asked whether merit promotion might allow an employee to be promoted without having to take a test, responded "It can be done." Hurd Dep. (Def.'s Ex. 6) at 24:12-15. It is true that Hurd later qualified his testimony, stating that being "promoted without taking a test is not a policy in the department." *Id*. at 24:23-25:1. But regardless of whether it is a matter of formal policy, Hurd's testimony indicates that promotion without taking a test is possible.

Ultimately, however, Carter's argument is unavailing. For the fact remains that Carter has failed to make a prima facie showing that the Sheriff's refusal to promote him had anything to do with his race. Carter makes no attempt to show that he was qualified for merit promotion to the position of lieutenant or chief, or that any similarly-situated, non-African-American

employees received merit promotions to these positions despite being no more qualified than he.

I note that this conclusion does not depend on Carter's use of the burden-shifting framework. The Seventh Circuit has emphasized that, regardless of the method of proof, "the sole question that matters" is whether a reasonable juror could conclude that the plaintiff would have been promoted "if he had a different ethnicity, and everything else had remained the same." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). Carter has offered no evidence from which a reasonable juror could draw such a conclusion in his case. Carter has shown only that the Sheriff has failed to promote him. He has presented no evidence that the Sheriff's failure to promote him was unjustified, much less that the Sheriff's failure to promote him was based on his race.

Accordingly, the Sheriff's motion for summary judgment is granted as to Carter's failure-to-promote claim.

**2.    Failure to Train**

Count I of Carter's complaint also asserts that the Sheriff discriminated against him by failing to train him. This claim is based on Carter's allegation, asserted in memos he circulated in 2010, that he was disciplined for failing to carry out tasks that he was never trained to perform.

As an initial matter, since the conduct on which the claim is based occurred in 2010, and since the continuing violation doctrine does not apply to failure-to-train claims, *see, e.g.*, *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013), the claim is untimely. In addition, Carter's failure-to-train claim fails because, as Carter appears to concede, he did not mention it in his EEOC charge. *See, e.g.*, *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002) ("Generally a plaintiff may not bring claims under Title VII that were not originally brought among the charges to the EEOC.") (quotation marks omitted). True, a claim not included in an EEOC charge may be asserted in a Title VII suit if the charge and the complaint "describe the same conduct and implicate the same individuals." *Id*. But that is not true here. Carter's complaint does not identify any individuals by name in connection with his failure-to-train claim. And the conduct at issue in the EEOC charge (i.e., denial of promotions and subjection to harassment) is unrelated to the conduct on which his failure-to-train claim is based. Carter does not assert, for example, that he was denied promotion to lieutenant or chief because he was never properly trained for these positions. Rather, Carter's failure-to-train claim alleges that

he was unfairly disciplined for improperly carrying out tasks he was never trained to perform.

In any case, Carter's failure-to-train claim fails on the merits. "In a failure to train claim the plaintiff must demonstrate: (1) that he is a member of a protected group; (2) that the [defendant] provided training to its employees; (3) that he was eligible for training; and (4) that he was not provided training under circumstances giving rise to an inference of discrimination, i.e., that he was denied training given to other similarly situated employees who were not members of the protected group." *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000). Carter has offered no evidence or argument addressing any of these elements.

The Sheriff is therefore entitled to summary judgment on Carter's failure-to-train claim.

**3.    Hostile Work Environment**

Lastly, Count I of Carter's complaint asserts that he was subjected to a hostile work environment on account of his race. "To prove a claim for hostile work environment based on race, an employee must show that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer

liability." *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838
F.3d 888, 895-96 (7th Cir. 2016) (quotation marks omitted). The
Sheriff concedes that the incidents described by Carter
constitute "unwelcome harassment" and that the harassment was
severe enough to alter the conditions of his employment.
However, the Sheriff contends that there is no evidence that the
harassment was racially-motivated and no evidence that would
support a finding of employer liability.

### a. Employer Liability

For purposes of a hostile work environment claim, an
employer's liability can be established by showing either that
the employee's supervisors were directly involved in the
harassment, or that the employer was negligent in discovering
and/or remedying the harassment. *See, e.g.*, *Williams v. Waste
Mgmt. of Illinois*, 361 F.3d 1021, 1029 (7th Cir. 2004). Carter
does not allege that his supervisors were involved in the
harassment. *See* Pl.'s Resp. Br. at 9. He must therefore show
that the Sheriff was negligent in addressing his harassment.
This requires Carter to show that the Sheriff "failed to take
prompt and appropriate corrective action reasonably likely to
prevent the harassment from recurring." *Cole v. Bd. of Trustees
of N. Illinois Univ.*, 838 F.3d 888, 898 (7th Cir. 2016)
(quotation marks omitted).

There is evidence in the record from which a jury could reasonably conclude that the Sheriff failed to take prompt and appropriate action in response to Carter's complaints of harassment. In connection with the April 2012 incident, the record indicates that 180 to 200 copies of the offensive picture were on display for a week in various locations throughout Division 1. A jury could reasonably conclude that Carter's superiors were aware of the pictures for some time and acted negligently by failing to take them down sooner or otherwise address the situation until Carter complained.

Similarly, there is evidence from which a jury could conclude that Carter's supervisors were negligent in dealing with the July 2014 incident in Division 6. According to the Sheriff's General Order 11.4.5.0, supervisors are responsible for providing victims of discrimination and harassment with a specific form, which the supervisor is then required to forward to the OPR. *See* Pl.'s Ex. E. at 5 ("Upon receiving a complaint of alleged discrimination or harassment/sexual harassment, it is the responsibility of the complainant's supervisor to inform the complainant that he/she may file a complaint with OPR and provide the complainant with a Discrimination/Harassment/Sexual Harassment Form.... The supervisor must forward ... [the] Form to OPR."). It is undisputed that Carter's supervisor at the time, Lieutenant Hurd, did not provide Carter with the form.

Hurd testified that this was because he did not believe the posting of the pictures to have been malicious and thus did not consider Carter to have been a "victim." However, other witnesses, such as Superintendent Salomon Martinez ("Martinez"), testified in his deposition that he believed the incident *was* malicious. *See* Martinez Dep. (Pl.'s Ex. B) at 106:2-5. Further, there is evidence that Hurd was aware of the previous incidents involving Carter in Division 1. *See* Hurd Dep. at 57:15-58:2. On this record, a jury could reasonably find that Hurd should have taken more aggressive action in dealing with the matter to prevent the incidents from recurring.[8]

Hence, Carter has offered sufficient evidence to support a finding of employer liability for his harassment.

### b. Racial Motivation

The Sheriff next argues that there is no evidence that Carter's harassment was based on racial animus. According to the Sheriff, there is no explicit reference to race in any of the pictures forming the basis for Carter's harassment complaints. In addition, it is undisputed that the individuals Carter suspected of posting the pictures in April 2012 were themselves

---

[8] In addition, as previously noted, there is no evidence suggesting that any investigation or action was taken following the August 2013 incident. This, too, could support a finding that Carter's supervisors were negligent in remedying the harassment.

African-American, and that, at the time of the incident, Carter did not complain that the harassment was racially-motivated.

Nevertheless, when the record is viewed in the light most favorable to Carter, a jury could reasonably find that Carter's harassment was racially-based. As an initial matter, the fact that the comments written on the pictures made no explicit mention of race is not dispositive. *See, e.g.*, *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) ("[F]orms of harassment that might seem neutral in terms of race (or sex or other protected status) can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status."). Here, Superintendent Martinez agreed during his deposition that the pictures from the July 2014 incident were "[c]lear examples of somebody being discriminated against at the very least for racial reasons and potentially other ones." *See* Pl.'s Ex. B, Martinez Dep. at 106:2-5.

Similarly, the fact that the individuals alleged to have posted the pictures were African-American does not preclude a finding that Carter's harassment was racial in nature. *See, e.g.*, *Ross v. Douglas Cty.*, *Nebraska*, 234 F.3d 391, 396 (8th Cir. 2000) ("[W]e have no doubt that, as a matter of law, a black male could discriminate against another black male because of such individual's race.") (quotation marks omitted); *cf.*

*Castaneda v. Partida*, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."). Nor in any case is it clear that all of the individuals alleged to have been involved in Carter's harassment were African-American. While the suspects behind the April 2012 incident were African-American, the record appears unclear as to who might have been behind the August 2013 incident; nor do the parties identify the race of Cordell Lyons, the individual apparently responsible for the July 2014 incident.

In short, the record contains evidence sufficient to support a finding that Carter's superiors were negligent in addressing his harassment and that the harassment was racially-motivated. As a result, while I grant the Sheriff's motion for summary judgment as to Carter's failure-to-promote and failure-to-train claims, I deny the motion as to Carter's hostile work environment claim.

## C.    Retaliation

In Count II of his complaint, Carter asserts that he suffered retaliation as a result of his complaints of discrimination and harassment. "To succeed on a Title VII retaliation claim, plaintiffs must present evidence of (1) a statutorily protected activity; (2) a materially adverse action

22

taken by the employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (quotation marks omitted).

The Sheriff argues that Carter cannot show that he was qualified for any of the promotions he was denied, and that, consequently, he cannot show that he suffered any adverse employment action as a result of his complaints. Being turned down for promotion, however, is only one of the adverse employment actions that Carter alleges. Carter additionally claims that he was subjected to a hostile work environment as a result of his complaints. *See* Compl. ¶ 62; *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 568 (7th Cir. 2004) (subjection to a hostile work environment constitutes an adverse employment action for purposes of Title VII).

The Sheriff also argues that Carter has failed to adduce any evidence of a causal relationship between his complaints and the harassment he experienced. The Sheriff notes that the complaint register pertaining to the April 2012 incident was filed by Assistant Executive Director Moreci in June 2012 and that Carter's EEOC charge was filed in September 2014. According to the Sheriff, Carter did not experience any incidents of harassment near these times. This argument ignores the complaint registers that Carter filed in November and December 2013. It also overlooks the fact that Carter's protected activity is not

limited to formal filings such as the complaint registers and the EEOC charge. Informal complaints may constitute protected activity as well. *See, e.g.*, *Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 674 (7th Cir. 2011) ("[A]n informal complaint may constitute protected activity for purposes of retaliation claims.") (quotation marks omitted).

Nevertheless, even when these other instances of protected activity are taken into account, there is no evidence of any causal relationship between Carter's complaints and the retaliation. In addition to the complaint registers filed in June 2012, November 2013, and December 2013, and EEOC charge filed in September 2014, Carter circulated memos complaining of harassment and/or discrimination in July and August 2010 and in April, August, September, and October of 2014. The episodes of harassment, however, took place in April 2012, August 2013, and July 2014. While there is no bright-line test for determining the degree of temporal proximity necessary to support an inference of causation, *see, e.g.*, *Hicks v. Forest Pres. Dist. of Cook Cty., Ill.*, 677 F.3d 781, 789 (7th Cir. 2012), the time between the 2010 complaints and any of the episodes of harassment is far too great. *See, e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven-week interval between complaint and adverse employment action, without more, did not support a finding of causation). Moreover, there can be

no causal relationship between the harassment and the memos Carter circulated in August, September, and October of 2014, since the latter occurred after any of the instances of harassment.

There is a potentially plausible degree of temporal proximity between Carter's April 2014 memo and the July 2014 incident involving the posting of the pictures in Division 6. But even assuming these two events were sufficiently close in time, Carter is unable to make a showing of causation because there is no evidence that the July 2014 incident was anything but a continuation of the harassment to which he had already been subjected. In order to support an inference of causation, Carter must show that something changed following his complaints -- that the harassment was "ratcheted up" after he spoke out. *See, e.g.*, *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir. 1996) (no evidence of causation for purposes of retaliation claim because the "allegedly retaliatory conduct was merely the continuation of the conduct giving rise to the complaints" and "[t]here was no ratcheting up of the harassment"); *see also Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2001) (no evidence of causation for purposes of retaliation claim where it was undisputed that plaintiff's superior treated her "as poorly before her filing of the EEOC charges as he did

afterwards"). Carter points to no evidence that his harassment became more pronounced after he complained.

Because Carter has failed to adduce evidence of a causal link between his protected activity and the harassment he experienced, his retaliation claim fails.

**D.   *Monell* Claim**

Count III of Carter's complaint asserts a § 1983 claim against the Sheriff under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). To establish municipal liability under *Monell*, a plaintiff must show that: "(1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." *Ovadal v. City of Madison, Wisconsin*, 416 F.3d 531, 535 (7th Cir. 2005) (alteration and quotation marks omitted).

Carter contends that the Sheriff's failure to establish procedures for addressing employee complaints "was so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision." Pl.'s Resp. Br. at 18 (quotation marks omitted). Aside from the facts of his own case, however, Carter points to no evidence to support a finding of such a pervasive practice in the Sheriff's Office. In his brief, Carter states that the "U.S. Department of Justice has

continually since 2007 inspected the Cook County Department of Corrections every six months looking for various criteria to be met." Pl.'s Resp. Br. at 18. In support of this claim, he cites the deposition testimony of Commander William Thomas ("Thomas"), Lieutenant Hurd's superior. But nothing in Thomas's testimony suggests that the inspections in question have any relevance to Carter's claims. Thomas mentioned the inspections in the course of explaining why he had been demoted from Superintendent to Commander. Specifically, Thomas stated that the demotion came after an inspection found that a division of the correctional facility previously under his supervision had failed to meet sanitation standards during a Justice Department inspection. *See* Deposition of Commander William Thomas at 30:3-16. Thomas's testimony contains no hint that the inspections had anything to do with the way the Sheriff dealt with employee complaints, or indeed that the inspections were anything other than routine.

Accordingly, I grant the Sheriff summary judgment as to Carter's *Monell* claim.[9]

## Conclusion

---

[9] The County argues that it should be dismissed from the suit because it cannot be liable for indemnification where there has been no finding of liability on the Sheriff's part. However, because Carter's hostile work environment claim survives summary judgment, the Sheriff is potentially liable. As a result, the County must remain in the suit as an indemnitor.

For the reasons discussed above, I grant the Sheriff's motion for summary judgment as to Count I of the complaint insofar as it is based on Carter's failure-to-promote and failure-to-train theories. I also grant the Sheriff summary judgment as to Count II's retaliation claim and Count III's *Monell* claim. The motion is denied only as to Carter's hostile workplace claim.

**ENTER ORDER:**

---
**Elaine E. Bucklo**
United States District Judge

Dated: February 15, 2017